United States District Court
Middle District of Florida
Orlando Division

**DEBRA YAGLE,**

    *Plaintiff,*

v.                                                                                                              **NO. 6:18-CV-2232-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

    *Defendant.*

## Order

Debra Yagle brings this action under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying her application for disability insurance benefits. Doc. 1. Under review is a decision by an Administrative Law Judge ("ALJ") dated January 18, 2018. Tr. 15–36. Summaries of the law and the administrative record are in the ALJ's decision, Tr. 15–36, and the parties' briefs, Docs. 17, 18, and not fully repeated here. Yagle argues the ALJ failed to sufficiently justify partially rejecting her testimony about her pain and functional limitations. *See generally* Doc. 17.

**I.    Background**

Yagle applied for disability insurance benefits in June 2015, claiming disability beginning on May 29, 2015. Tr. 185–91.

In a June 2015 function report and in December 2017 testimony, Yagle described symptoms and limitations. *See* Tr. 37–63, 243–50. For example, she stated she cannot sit all day, cannot sit and type while holding a phone to her ear, has difficulty typing because of arthritis in her hand, and can lift no more than a half-gallon of milk. Tr. 50, 53, 243. She stated she must alternate between sitting and standing for a brief postural change every ten to fifteen minutes. Tr. 50–53. She

stated she can do some dishes and laundry but cannot vacuum or mop. Tr. 56; *see also* Tr. 245 (stating she can do laundry, clean bathrooms, and dust but her husband usually vacuums). She stated her pain was eight to ten on a ten-point scale "all the time," with ten being "the kind of pain that would make you go to the ER every single time you had it," Tr. 57, and that her medication helped little, Tr. 55. She stated she had problems holding things and "constantly" dropped things. Tr. 46; *see also* Tr. 248 (stating she does not have "much grip" in her hands).

The ALJ found Yagle is insured through December 31, 2020. Tr. 17.

The ALJ found Yagle has severe impairments of degenerative disc disease, osteoarthritis in both knees, and osteoarthritis in both hands. Tr. 17. He found other impairments, including fibromyalgia,[1] were not severe during the period at issue because they were "generally asymptomatic" at that time. Tr. 18.

The ALJ found Yagle has the residual functional capacity ("RFC") to perform light work, except she is limited to frequent balancing and crouching; occasional climbing, stooping, kneeling, and crawling; and frequent bilateral grasping and fingering; and she must be allowed to alternatively sit and stand every ten to twenty minutes for a brief postural change without leaving the workstation. Tr. 21. In formulating the RFC, the ALJ found Yagle's medically determinable impairments could reasonably be expected to cause the alleged symptoms but her statements about the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the evidence "for the reasons explained in this decision." Tr. 22.

The ALJ gave substantial weight to an opinion of James Mabry, M.D., a state-agency reviewing physician, who found Yagle could perform light work with only

---

[1]The ALJ explained Yagle's medical records "show a long history of chronic, widespread pains variously diagnosed as inflammatory poly-arthropathy, fibromyalgia, lupus, Sjögren's syndrome, and chronic pain" and found that "during the period at issue …, these conditions appear generally asymptomatic." Tr. 18. In her brief, Yagle mentions only the fibromyalgia diagnosis and ignores the other diagnoses. *See generally* Doc. 17. The Court therefore focuses on fibromyalgia.

frequent balancing and crouching and only occasional climbing, stooping, kneeling, and crawling. Tr. 27. The ALJ gave minimal weight to an RFC assessment of Edward Hoglund, D.C., a chiropractor, explaining Hoglund had examined Yagle only once and his examination was grossly inconsistent with contemporaneous examinations and Yagle's own reported activities. Tr. 27. The ALJ gave little weight to an RFC assessment by an unknown person "for similar reasons discussed with Hoglund's opinion." Tr. 27. The ALJ gave little weight to statements of Yagle's daughter and husband, explaining they are not acceptable medical sources, they have no treating relationship with Yagle, they have no professional qualifications, their opinions were of little value because they were not "functional or diagnostic in nature," their opinions would "naturally tend to be colored by affection" for Yagle, and their opinions were inconsistent with other record evidence. Tr. 27–28.

The ALJ summarized the medical evidence in detail, beginning years before the alleged onset date. Tr. 22–27. The ALJ relied on MRIs showing abnormalities in Yagle's cervical and lumbar spines and a left-knee surgery she underwent in May 2017 to support several limitations: light work, the sit/stand option, and the postural limitations. *See, e.g.*, Tr. 23 (citing November 2014 cervical spine MRI to support limiting Yagle to light work with postural restrictions; citing November 2014 lumbar spine MRI to support the sit/stand option); Tr. 24 (citing May 2016 lumbar spine MRI showing "possible" impingement of the extraforaminal right L3 nerve root to support sit/stand option; citing May 2016 cervical spine MRI to support limiting Yagle to light work with postural restrictions); Tr. 25–26 (relying on Yagle's May 2017 left-knee arthroplasty to support limiting her to light work with postural restrictions).

The ALJ declined to impose greater exertional or postural limitations because "the clinical examinations usually show normal gait and good strength with only a few sporadic abnormalities," Tr. 24; "the many findings of normal strength and sensation contradict greater limitations," Tr. 24–25; "the physical examinations often show full range of motion in the neck despite the cervical spine impairment," Tr. 25; and treatment notes from Janis Black, D.O., from February to April 2017 show

3

normal examinations and that Yagle was walking daily, riding her bike, and planned to join a local gym, Tr. 25.

The ALJ cited supporting evidence. *See* Tr. 24–26 (citing, for example, Tr. 679–82 [August 12, 2015, treatment note from Steven Smith, D.C., showing "mild" decrease of lumbar extension with otherwise normal range of motion in lumbar and cervical spines]; 861–63 [August 26, 2015, treatment note from Terri-Ann Brogan, D.O., showing normal range of motion in neck and throughout musculoskeletal system; normal gait, strength, motor function, and sensory function; and no evidence of muscle spasm]; 855–58 [September 28, 2015, treatment note from Dr. Brogan showing normal range of motion in neck and throughout musculoskeletal system; normal strength and tone; and no evidence of muscle spasm]; 675–78 [October 20, 2015, treatment note from Dr. Smith showing "mild" decrease of lumbar extension with otherwise normal range of motion in lumbar and cervical spines]; 848–50 [March 8, 2016, treatment note from Dr. Brogan showing normal range of motion in neck and throughout musculoskeletal system and normal strength and tone]; 871–76 [May 2, 2016, treatment note from Anne Gregg, P.A., showing some tenderness in spine, some decreased sensation, and antalgic gait but normal range of motion and good strength]; 690–93 [May 27, 2016, treatment note from rheumatologist Sanjiv Kapil, M.D., showing decreased grip strength in wrists and some tender points but normal gait, sensation, and strength]; 684–87 [July 8, 2016, treatment note from Dr. Kapil showing tenderness but normal gait, sensation, and strength]; 828–31 [August 26, 2016, treatment note from Dr. Brogan showing normal gait, coordination, motor functioning, sensory functioning, and strength and normal range of motion in neck and throughout musculoskeletal system]; 824–26 [December 2, 2016, treatment note from Dr. Brogan showing normal range of motion in neck and throughout musculoskeletal system; normal strength, tone, and gait; and no evidence of spasm]; 821–23 [December 16, 2016, treatment note from Dr. Brogan showing normal range of motion in neck and throughout musculoskeletal system; normal strength, tone, and gait; and no evidence of spasm]; 794–96 [February 1, 2017, treatment note from Dr. Black showing normal gait, no joint swelling or tenderness, no muscle spasm, and

4

normal range of motion; noting Yagle said she used Tramadol only as needed for back pain and took it very rarely]; 787–93 [February 16, 2017, treatment note from Dr. Black noting Yagle reported walking daily and having plans to get back into bike riding and joining local gym; showing normal gait, no joint swelling or tenderness, normal range of motion, and no muscle spasm]; 774–75 [March 31, 2017, treatment note from Dr. Black stating Yagle said she planned to get back to gym once she resolved some issues with her father's health care]; 772 [April 21, 2017, treatment note from Dr. Black showing normal gait, no joint swelling or tenderness, normal range of motion, no motor deficits, and no muscle spasm; noting Yagle said she was riding her bike]; 716 [May 16, 2017, treatment note from Robert Sedaros, M.D., showing Yagle had "excellent range of motion" with "no instability" in her knee following surgery]; 715 [June 13, 2017, treatment note from Dr. Sedaros showing Yagle was doing well after surgery and had "excellent range of motion of the knee" with "no varus or valgus instability"]; 714 [September 5, 2017, treatment note from Dr. Sedaros showing Yagle was ambulating well with no restriction and was "doing excellent"; releasing Yagle to "full activities"]; 652–55 [September 5, 2017, treatment note from Dr. Smith showing "mild" decrease in lumbar extension with otherwise normal range of motion throughout lumbar and cervical spines]; 648–51 [September 21, 2017, treatment note from Dr. Smith showing "mild" decrease in lumbar extension with otherwise normal range of motion in lumbar and cervical spines]; 644–50 [September 28, 2017, treatment note from Dr. Smith showing same findings as September 21 treatment note]; 762–64 [October 6, 2017, treatment note from Dr. Black showing normal gait and Yagle wanted to "get back into walking and exercise now that she is better" after knee surgery]).

Regarding manipulative limitations, the ALJ explained an April 16, 2015, orthopedic examination showed Yagle retained normal grips and sensation, "which supports the conclusion that she could perform frequent bilateral grasping and fingering." Tr. 24. He also explained May 2016 x-rays of Yagle's hands showed "marked" joint space narrowing and irregularity of the DIP joints, which "admittedly" could "suggest significant limitations." Tr. 25. But he added "the clinical

5

examinations discussed throughout this decision usually show normal range of motion, strength, and grip with only a few sporadic abnormalities," and he therefore found Yagle could perform frequent grasping and fingering. Tr. 25. In discussing Dr. Kapil's May 27, 2016, examination showing decreased grip strength, he stated the examination "supports limiting the claimant to frequent grasping and fingering." Tr. 25. He acknowledged Hoglund found Yagle had "very weak" grip strength on September 7, 2017, but observed "the evidence shows no other visits with Hoglund and the claimant's other treatment records contradict these findings." Tr. 26.

The ALJ concluded:

> In sum, the medical imaging of the claimant['s] spine, knees, and hands shows some severe findings that support limiting the claimant to light work with frequent balancing and crouching, occasional climbing, stooping, kneeling, and crawling, frequent bilateral grasping and fingering, and a sit/stand option every 10–20 minutes. However, the clinical findings and many of the subjective reports in the treatment records, discussed extensively above, contradict greater [limitations]. Those records often show normal strength, normal gait, normal range of motion, and normal sensation.

Tr. 26–27.

Based on the RFC and testimony from a vocational expert, the ALJ found Yagle can perform her past relevant work as an office manager as generally performed, observing the office manager job is sedentary, skilled work. Tr. 28. The ALJ therefore found no disability. Tr. 28.

## II. Standard of Review

A court reviews the Commissioner's factual findings for substantial evidence. 42 U.S.C. § 405(g). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and quoted authority omitted). A court may not decide facts anew,

reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). If substantial evidence supports an ALJ's decision, a court must affirm even if other evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "This restrictive standard of review applies only to findings of fact," and "no similar presumption of validity attaches to the [Commissioner's] conclusions of law[.]" *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (internal quotation marks and quoted authority omitted).

"[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). If "remand would be an idle and useless formality," a reviewing court need not "convert judicial review of agency action into a ping-pong game." *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969).

## III. Arguments & Analysis

Yagle argues the ALJ improperly discounted her testimony about her pain and her functional limitations and improperly found her not disabled. She contends the ALJ erred by finding she generally had normal gait, range of motion, and sensation; by focusing too heavily on the objective medical findings, given her fibromyalgia diagnosis; and by failing to meaningfully consider the factors in 20 C.F.R. § 404.1529(c)(3). *See generally* Doc. 17.

### A. *Normal Gait, Range of Motion, and Sensation*

Yagle argues the ALJ improperly discounted her testimony based on his finding the medical records show she generally had normal gait, range of motion, and sensation. Doc. 17 at 13–15.

In evaluating a claimant's subjective complaints of pain or other symptoms, an ALJ undertakes a two-step process. 20 C.F.R. § 404.1529; *see also* Social Security

7

Ruling ("SSR") 16-3p, 2017 WL 5180304[2]; *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). For the first step, the ALJ determines whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p. For the second step, the ALJ evaluates the "intensity and persistence" of the symptoms and determines the extent to which the symptoms limit the ability to perform work-related activities. 20 C.F.R. § 404.1529(c) (quoted); SSR 16-3p. An ALJ must consider all available evidence, including objective medical evidence and statements from the claimant and others. 20 C.F.R. § 404.1529(c)(2)–(3); SSR 16-3p. The ALJ must consider factors that include evidence of daily activities; the location, duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment other than medication for relief of pain or other symptoms; and measures taken to relieve pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)–(vi); *see also* SSR 16-3p. An ALJ also must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." *Id.* § 404.1529(c)(4); *see also* SSR 16-3p. An ALJ must articulate the reasoning. *Holt*, 921 F.2d at 1223.

Here, the ALJ undertook this two-step process, and, as explained, the detailed decision describes substantial evidence supporting the finding Yagle's claimed restrictions were not fully supported by the record, including medical-examination findings, her reports of activities to her healthcare providers, and Dr. Mabry's opinion. *See generally* Tr. 24–28.

---

[2] SSR 16-3p, which provides guidance on the evaluation of symptoms and rescinds SSR 96-7p, became effective on March 28, 2016. The Social Security Administration expects federal courts to review a final decision using the rules in effect when the agency issued the decision. SSR 16-3p at n. 27. Because the ALJ issued the decision on January 18, 2018, Tr. 29, SSR 16-3p applies here. SSR 16-3p did not alter the methodology for evaluating symptoms; rather, SSR 16-3p eliminated use of the term "credibility" because "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p.

Yagle argues the ALJ erred in suggesting her complaints of pain were contradicted by "normal" examinations in the record. Doc. 17 at 13 (citing Tr. 27). She argues substantial evidence does not support the suggestion because "[t]he most recent MRIs showed that [she] had a herniated disc in her lumbar spine that was impinging on the right L3 nerve root, and herniated discs in her cervical spine that were impinging on the C5 nerve root." Doc. 17 at 13 (citing Tr. 628). She argues that evidence "supports [her] testimony that she has severe, radiating pain in her arms and legs." Doc. 17 at 13.

This argument is unpersuasive. The ALJ discussed the medical records at length, including MRIs and other studies showing "some severe findings," and examination notes often showing normal strength, gait, range of motion, and sensation. Tr. 22–27. After weighing the evidence, he assigned limitations (light work; only frequent balancing and crouching; only occasional climbing, stooping, kneeling, and crawling; only frequent bilateral grasping and fingering; and a sit/stand option) but declined to impose additional limitations. Tr. 22–28. Although Yagle points to the MRI results as evidence supporting her subjective complaints of pain, the question is not whether evidence could have supported a decision to credit Yagle's testimony, but rather whether substantial evidence supports the ALJ's decision to partially discount Yagle's testimony. *See Martin*, 894 F.2d at 1529. As explained, it does, and the Court cannot reweigh the evidence or substitute its judgment for the ALJ's judgment. *See Moore*, 405 F.3d at 1211.

Yagle contends the record contradicts the ALJ's assertion she generally had "normal" strength, gait, range of motion, and sensation, citing treatment notes of Dr. Kapil showing she had positive tender points. Doc. 17 at 13. The finding of positive tender points does not contradict the finding Yagle generally had normal strength, gait, range of motion, and sensation. The same records from Dr. Kapil state Yagle had normal gait, sensation, and strength. *See* Tr. 685, 692.

Yagle cites two treatment notes from Anne Gregg, P.A., at the Brevard Spine & Pain Clinic showing Yagle had an antalgic gait, positive straight leg raising test,

9

lumbar and cervical tenderness, a reduced range of motion, and diminished sensation in her right arm and left leg. Doc. 17 at 13 (citing Tr. 864, 873). She also cites Hoglund's report showing decreased range of motion in her lumbar and cervical spines, with tenderness; a positive straight leg raising test on the right; diminished sensation; and "very weak" grip strength in her hands. Doc. 17 at 13–14 (citing Tr. 638–39). Again, the question is not whether some evidence might support Yagle's claimed limitations; rather, the question is whether substantial evidence supports the ALJ's decision to partially discount her claims. As explained, it does. The Court cannot reweigh the evidence or substitute its judgment for the ALJ's judgment, *see Moore*, 405 F.3d at 1211, and, in any event, the normal examinations outnumber the less-than-normal findings by Gregg and Hoglund.

Yagle argues many of the "normal" examinations the ALJ cited took place before the onset date of May 29, 2015, and the ALJ should have given no weight to these examinations. Doc. 17 at 14. While the ALJ mentioned some normal examinations that occurred before the onset date, *see, e.g.*, Tr. 23–24, the Court does not understand the ALJ to have used those when "weighing" the normal examinations against the abnormal examinations. Instead, the ALJ discussed the pre-onset medical records as background for his discussion of the post-onset records. *See, e.g.*, Tr. 23 ("[A]lthough the medical evidence of record supports some limitations arising from the claimant's impairments, the medical imaging, objective examinations, and other diagnostic techniques usually show only mild or moderate abnormalities *with many normal findings since the alleged onset date.*" (emphasis added)). And, as explained, in discussing those post-onset records, he cited many examinations with grossly normal findings.

Yagle contends the ALJ was wrong to state the records from Dr. Smith did not show significant problems. Doc. 17 at 14. She contends they "[a]ctually show that [she] had mildly reduced cervical and lumbar lordosis; mildly reduced lumbar range of motion; pain with cervical range of motion[;] and myofascial trigger points and stiffness throughout her spinal region" and "establish that [she] does have physical limitations." Doc. 17 at 14. But Yagle fails to explain how such findings—many of

which show "minor" problems—amount to "significant" problems or contradict the ALJ's overall finding that the records usually showed normal gait and strength with only "a few sporadic abnormalities." Even if the ALJ erred in failing to discuss Dr. Smith's treatment notes in more detail, Yagle shows no harm. The ALJ did not dispute that Yagle's back and neck problems resulted in physical limitations; he attributed limitations to them. He found her testimony unsupported by the record to the extent her testimony reflected a need for greater limitations. She fails to explain how his findings would support limitations greater than those imposed by the ALJ, let alone the limitations she testified to at the hearing.

Yagle observes the ALJ "noted a treating orthopedist, Dr. Sedaros, did not list any problems in his treatment notes other than [her] left knee, but that was the only impairment that Dr. Sedaros was treating—there is no evidence that he ever conducted an evaluation of [her] neck and back." Doc. 17 at 14. The Court does not read the ALJ's decision to have relied on Dr. Sedaros's treatment notes to suggest her back and neck were normal. The ALJ instead relied on them to evaluate the limitations associated with the arthritis in her knees. *See, e.g.* Tr. 25–26 ("Consequently, on May 3, 2017, the claimant underwent left knee arthroplasty, performed by Dr. Sedaros. This supports limiting the claimant to light work with the postural restrictions detailed above in the RFC.") (internal citation omitted).

Yagle contends the other "normal" examinations the ALJ cited "were from [her] primary care physician, Dr. Black, who did not treat [her] for her orthopedic impairments or for fibromyalgia" and the "ALJ erred by giving more weight to Dr. Black's cursory reports than to the detailed evaluations of [her] specialists." Doc. 17 at 14–15. Yagle disregards that the ALJ also cited "normal" examinations by Dr. Brogan, who treated her for fibromyalgia. *See* Tr. 848 (March 8, 2016, treatment note from Dr. Brogan showing Yagle presented for continued medical management of fibromyalgia). But even if Dr. Brogan is not a specialist and her examinations are lumped with Dr. Black's "cursory reports," the argument still fails. Yagle appears to invoke the general rules governing the weight the Social Security Administration must give to medical opinions, which give more weight to opinions of treating

specialist physicians than those of treating non-specialists and more weight to opinions of treating sources than those of non-treating sources. But those rules give no particular weight to opinions from sources (like physician assistants and chiropractors) that are not acceptable medical sources.[3]

The general rules on weighing medical opinions do not help Yagle. The three "abnormal" examinations on which she relies were rendered by a physician assistant and a chiropractor, neither of which was an acceptable medical source for her claim. The abnormal opinions were not rendered by the kind of "specialists" whose opinions

---

[3]The Social Security Administration evaluates every medical opinion it receives. 20 C.F.R. § 404.1527(c). A "medical opinion" is a statement from an "acceptable medical source" that reflects judgment about the nature and severity of a claimant's impairment. *Id.* § 404.1527(a)(1). For claims filed before March 27, 2017, an "acceptable medical source" is a licensed physician, licensed or certified psychologist, licensed optometrist, licensed podiatrist, or qualified speech-language pathologist. *Id.* § 404.1513(a) (2013); *compare id.* § 404.1502(a)(7) (2017) (defining "acceptable medical source" to include a "Licensed Physician Assistant" as an acceptable medical source for "impairments within his or her licensed scope of practice," but only for claims filed on or after March 27, 2017).

Generally, the Social Security Administration gives "more weight" to an opinion from a treating source. *Id.* § 404.1527(c)(2). Only an "acceptable medical source" can give medical opinions or be considered a treating source. *Id.* § 404.1527(a)(1)–(2). If the agency finds the treating source's opinion on the nature and severity of an impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the agency will give the opinion "controlling weight." *Id.* If the agency does not give a treating source's opinion controlling weight, it will consider the examining relationship, the treatment relationship, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and any other factors that tend to support or contradict the opinion. *Id.* § 404.1527(c). An opinion of a treating specialist is entitled to the most weight, while an opinion of a non-examining, reviewing physician is entitled to the least weight. *Id.* § 404.1527(c)(1)–(2). Opinions from providers who are not acceptable medical sources are not entitled to controlling weight over opinions from acceptable medical sources. *Farnsworth v. Soc. Sec. Admin.*, 636 F. App'x 776, 784 (11th Cir. 2016).

receive increased weight.[4] Thus, even under the general rules, the normal examination findings of Dr. Black—a treating physician—would be entitled to more weight than the abnormal examination findings on which Yagle relies.[5]

Remand to reconsider the objective medical evidence is not warranted.

## B.     *Focus on Physical Examinations*

Yagle argues the ALJ "erred by focusing so heavily on the objective physical examinations because the record reflects that much of [her] pain is due to fibromyalgia." Doc. 17 at 15.

Fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012). "[T]he symptoms and signs … may vary in severity over time and may even be absent on some days." *Id.* Fibromyalgia "often lacks medical or laboratory signs" and "is generally diagnosed mostly on [an] individual's described symptoms." *Moore*, 405 F.3d at 1211. As a result, an ALJ may err in discounting a fibromyalgia claimant's testimony based on the lack of objective evidence documenting the impairment. *See Stewart v. Apfel*, 245 F.3d 793 (table), No. 99-6132, 2000 U.S. App. LEXIS 33214, at *9 n.4 (11th Cir. Dec. 20, 2000) (unpublished). But when a claimant testifies her physical impairments were caused by fibromyalgia along with other conditions, it is appropriate for the ALJ to consider whether objective evidence corroborates the limitations caused by the other conditions. *See Horowitz v. Comm'r of Soc. Sec.*, 688

---

[4]As explained, Yagle also cites the treatment notes of a treating specialist physician, Dr. Kapil, Doc. 17 at 13, but those notes support the ALJ's finding that Yagle had normal strength, gait, range of motion, and sensation.

[5]As explained, the ALJ also gave "minimal weight" to Hoglund's opinions in part because his September 2017 examination of Yagle was "grossly inconsistent" with the other examinations of record. Tr. 27. Yagle does not challenge the ALJ's discounting of Hoglund's opinions, *see generally* Doc. 17, further undermining any claim that the ALJ should have given the results of his examinations more weight than those of Dr. Black.

13

F. App'x 855, 863 (11th Cir. 2017) (rejecting claimant's argument that ALJ could not discredit her subjective complaints as inconsistent with the objective medical evidence because her conditions were caused by fibromyalgia, explaining, "The flaw in [claimant's] argument is that she testified that at least some of her physical impairments, such as the injuries to her right leg that required her to walk with a cane, were the result of the injuries she suffered when she was the victim of a violent crime. As such, it was appropriate for the ALJ to consider whether there was objective evidence corroborating this injury. And because there are no objective findings—such as evidence that she had ineffective ambulation or abnormal gait—to corroborate her account about the symptoms and pain in her right leg, substantial evidence supported the ALJ's credibility determination.").

Yagle offers no citation or support for her claim that "the record reflects that much of [her] pain is due to fibromyalgia." *See* Doc. 17 at 15. At the administrative hearing, the ALJ found Yagle "alleged disability resulting primarily from the above-listed orthopedic conditions [degenerative disc disease and osteoarthritis of the knees and hands]." Tr. 18. He also found Yagle's fibromyalgia was non-severe because it was "generally asymptomatic" during the period at issue. Tr. 18. Yagle does not challenge those findings or claim substantial evidence does not support them.[6] Although the ALJ partially discredited Yagle's testimony based on the lack of supporting objective evidence, he did so in discussing Yagle's other impairments (degenerative disc disease and osteoarthritis in the knees and hands). *See generally* Tr. 22–28. The ALJ could test the claimed limitations associated with those impairments against the objective medical evidence. *See Horowitz*, 688 F. App'x at 863.

---

[6]The ALJ cited evidence for his finding Yagle's fibromyalgia was generally asymptomatic during the period at issue. *See* Tr. 18 (citing Tr. 684–85, a July 2016 treatment note from Yagle's rheumatologist). Yagle does not argue the evidence was insufficient to support the finding her fibromyalgia was generally asymptomatic during the period at issue.

14

Remand to reconsider the limitations caused by Yagle's fibromyalgia is not warranted.

## C. 20 C.F.R. § 404.1529(c) Factors

Yagle argues the ALJ gave "no significant consideration to the 20 C.F.R. § 404.1529(c)(3) factors." Doc. 17 at 15. She claims "there is no mention of [her] daily activities, which are rather limited," Doc. 17 at 15, and the ALJ did not "address the dosage and effectiveness of [her] medications, or the other types of treatment that she has tried to relieve her pain," Doc. 17 at 16.

Yagle's argument is unpersuasive. The ALJ discussed Yagle's self-reported daily activities—including walking daily and riding a bicycle. Tr. 25; *see also* Tr. 21 (citing Tr. 244–45 and observing that Yagle's June 2015 disability report showed she could still complete most activities).[7] He also discussed Yagle's medications and the treatments she has tried to relieve her pain. *See, e.g.*, Tr. 22 ("Additionally, the claimant alleged that her pain is usually 8–10/10 on the numeric pain scale, but she denied going to the emergency room and stated that she only occasionally takes Tramadol without stronger medications. She testified that she has been referred for back surgery but does not want to pursue it because her previous surgery in 2009 was not successful."); Tr. 26 (discussing records from Dr. Sedaros showing that, after knee surgery, Yagle was "doing excellent," was "ambulating well without any restrictions,"

---

[7]In her June 2015 disability report, Yagle stated that, each day, she gets dressed and does any light housekeeping, reads, goes to the beach or meets a friend for lunch, watches some TV, has dinner, and feeds her dog. Tr. 244. She identified no problems with personal care. Tr. 244. She wrote she makes cereal, toast, sandwiches, and sometimes a complete meal at dinner each day but does not like to cook large meals because doing so is hard on her body. Tr. 244. She wrote she does laundry, cleans bathrooms, and does some dusting for three-quarters of a day, once a week, but her husband usually vacuums. Tr. 244. She wrote that she swims every day and rides a bicycle sometimes but that boating and riding a motorcycle bother her. Tr. 245.

and could be released to "full activities"). He did not, as Yagle argues, fail to consider these factors.[8]

Yagle observes the ALJ stated she had been "able to work as an office manager for several years even though she has been having back problems with her back for over a decade." Doc. 17 at 16 (citing Tr. 27). She points out her hearing testimony shows her condition worsened in December 2014 and argues the "fact that [she] had an excellent employment history prior to this medical decline does not prove that she is able to work now." Doc. 17 at 16.

The ALJ observed Yagle "successfully worked as an office manager for several years with these impairments." Tr. 27. The Court does not read the decision as saying Yagle's work history means she can work now or discredits her testimony. The ALJ's detailed decision discusses her post-onset medical records, including those suggesting new or worsening symptoms. *See, e.g.*, Tr. 24–26. Even if the ALJ erred in mentioning or considering her pre-onset employment history, she shows no harm because other substantial evidence supports the ALJ's decision to partially discount her testimony, including the generally normal examinations, her reports of activities to her health care providers, and Dr. Mabry's opinion.

Remand to reconsider the § 404.1529(c) factors is not warranted.

---

[8]Yagle argues, "Since the record shows that [her] symptoms have not responded to either conservative or aggressive treatment measures, the ALJ should have given great weight to [her] testimony." Doc. 17 at 16. She provides no authority or support for that argument.

## IV. Conclusion

The Court **affirms** the Commissioner's decision and **directs** the clerk to enter judgment for the Commissioner and against Debra Yagle and close the file.

**Ordered** in Jacksonville, Florida, on March 23, 2020.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c: Counsel of record